**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>    *Plaintiff*,<br><br><br>   v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.,<br><br>    *Defendants*. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff UFCW Local 1500 Welfare Fund brings this class action against Defendants Johnson & Johnson and Janssen Biotech, Inc. (collectively, "J&J") for claims under federal and state antitrust laws and state consumer protection laws to recover damages and obtain injunctive and equitable relief for the substantial injuries it and others similarly situated have sustained arising from J&J's anticompetitive scheme to abuse its monopoly power, exclude competition, and raise prices for Remicade®, a biologic medication used to treat chronic illnesses such as rheumatoid arthritis, plaque psoriasis, and Crohn's disease. Plaintiff's allegations are based on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      In 1998, J&J's biologic Remicade (infliximab) was approved by the FDA to treat severely active Crohn's disease. Since its initial FDA approval, Remicade has also been approved for the treatment of other autoimmune disorders including ulcerative colitis, rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, and plaque psoriasis.

2.      For almost two decades Remicade was the only infliximab product on the market. Remicade is J&J's best-selling drug by a wide margin, generating approximately $5.7 billion in U.S. sales in 2015 alone.[1] For most patients, the cost per infused dose ranges between $4,000-$6,000, depending on the number of vials and the length of the infusion.[2] A full year of treatment could cost upwards of $26,000.

3.      However, in April 2016, new entrants to the infliximab market began to challenge J&J's dominance. Specifically, on April 5, 2016, Pfizer Inc. received FDA approval of

---

[1] See FiercePharma, "Remicade," http://www.fiercepharma.com/special-report/14-remicade.

[2] See Minnesota Gastroenterology, P.A., "Infliximab (Remicade) Infusion Price Quote (Jan. 2016), http://www.mngastro.com/sites/default/files/Price%20Quote%20Remicade-16.pdf.

Inflectra® (infliximab-dyyb), which was the first biosimilar (i.e., a generic version of a branded biologic drug) to Remicade. And, more recently, Merck & Co. (in partnership with Samsung Bioepsis) received FDA approval of Renflexis® (infliximab-abda) on April 21, 2017.

4.    Pfizer began shipping Inflectra in November 2016 and set its initial list price, often referred to as the wholesale acquisition cost, or "WAC," at $946 a vial—a 15% discount off Remicade's then-price of $1,113.[3] And, by July 24, 2017, Merck announced that it had begun shipments of Renflexis at a WAC of $735.39—a 35% discount off Remicade's then-price of $1,131.37.[4]

5.    Faced with the prospect of competition from these lower cost biosimilars, J&J deployed a multi-pronged effort to protect its monopoly.

6.    As an initial step, J&J launched its "Biosimilar Readiness Plan."[5] According to Joaquin Duato, worldwide chairman of Johnson & Johnson's pharmaceuticals group, through this plan, the company planned to combat Pfizer's launch in two ways: (1) continuing its aggressive defense of J&J's purported intellectual property rights over Remicade, despite the fact that Pfizer had successfully challenged J&J's Remicade patent at the trial court level; and (2) employing a significant sales force to preach the superiority of Remicade, despite FDA's

---

[3] *See* NPR, "Small Savings For Drugs Made To Mimic Biotech Blockbusters" (Oct. 19, 2016), http://www.npr.org/sections/health-shots/2016/10/19/498559386/small-savings-for-drugs-made-to-mimic-biotech-blockbusters.

[4] *See* Merck Investor Relations Press Release, "Merck Announces U.S. Launch of RENFLEXIS (infliximab-abda), a Biosimilar of Remicade, for All Eligible Indications" (July 24, 2017), http://investors.merck.com/news/press-release-details/2017/Merck-Announces-US-Launch-of-RENFLEXIS-infliximab-abda-a-Biosimilar-of-Remicade-for-All-Eligible-Indications/default.aspx.

[5] *See* FiercePharma, "Stay calm, investors. J&J has a 'readiness plan' in place for Remicade biosim launch" (Oct. 18, 2016), http://www.fiercepharma.com/pharma/j-j-drug-sales-soar-q3-but-remicade-biosimilar-looms.

determination that there are no clinically meaningful differences between Remicade and its biosimilars.[6]

7.    However, what was left undisclosed to the public was that J&J was also undertaking non-public anticompetitive tactics to thwart competition to Remicade and maintain its monopoly. As further described below, J&J's anticompetitive scheme centered on its exclusionary contracts with insurers, coupled with coercive rebate policies and anticompetitive bundling, that were designed to block both insurers from reimbursing, and hospitals and clinics from purchasing, Remicade biosimilars, despite their lower prices. J&J has threatened to withhold vital rebates on Remicade prescriptions for new and existing patients unless an insurer agrees to an exclusivity deal. More specifically, J&J imposed two types of exclusionary contracts upon nearly all healthcare insurers to make Remicade the only covered infliximab product.

8.    ***Pure Exclusion Contracts:*** Under these contracts, J&J requires insurers to agree that Remicade will be the only infliximab product that they will cover and reimburse for. That is, J&J requires insurers to exclude Remicade biosimilars from their plans. These contracts have effectively prevented patients from switching to a biosimilar to Remicade because customers would face enormous out-of-pocket costs should they opt for one, even when they are being sold at significant discounts to Remicade.

9.    ***Fail First Contracts:*** Under these contracts, insurers can only provide reimbursement for a Remicade biosimilar in situations where Remicade has been tried but proves ineffective in a given patient. Although "fail first" exceptions theoretically permit Remicade biosimilars to compete, they effectively create de facto exclusive contracts because it is highly

---

[6] *See id.*

3

unlikely that physicians would turn to a Remicade biosimilar should Remicade prove ineffective. Rather, a physician would likely prescribe a non-infliximab drug.

10.    Moreover, such "fail first" provisions do not incentivize clinics or hospitals to purchase and stock Remicade biosimilars. Thus, even if an insurance plan would cover a Remicade biosimilar, nearly all healthcare providers have declined to purchase competing biosimilars across the board due to the risk of denials of coverage.

11.    A key to J&J's ability to coerce insurers into accepting its exclusionary commitments is its denial of rebates to insurers that refuse J&J's exclusivity terms, thereby imposing a substantial financial penalty. Under these pure exclusive and fail first contracts, J&J provides insurers rebates and discounts on a suite of J&J products contingent on the coverage of Remicade to the exclusion of its biosimilar competitors. In addition to its overall threat to withhold rebates for Remicade if insurers do not agree to exclusivity, J&J has been bundling rebates for Remicade with rebates on other widely used products in return for commitments not to cover competing biosimilars. J&J's competitors in the infliximab market cannot effectively compete on these bundled rebates because they cannot and do not offer the same suite of products. Thus, in order to effectively compete, J&J's infliximab competitors would need to provide even more significant rebates on their Remicade biosimilars in order to compensate insurers for the loss of J&J's rebates.

12.    As a result of J&J's exclusionary measures to stifle competition, almost no national commercial health insurer provides coverage for Remicade biosimilars (except under the spurious "fail first" scenario), and the vast bulk of healthcare provider accounts using infliximab (approximately 90 percent) have not purchased Inflectra or Renflexis at all. For

example, despite some coverage by regional and government plans, Inflectra has *less than 4 percent* of total infliximab unit sales in the U.S. as of September 1, 2017.

13.     The harm to Plaintiff and Class Members, and to competition as a whole, is manifest. In response to new entrants offering lower prices for products deemed to have "no clinically meaningful differences" from the incumbent's brand, basic economics would predict that market-wide prices would fall. Instead, the opposite has occurred. Since the FDA's approval of Inflectra and Renflexis and J&J's implementation of its anticompetitive scheme to foreclose competition from biosimilars, J&J has *raised* the list price of Remicade by close to 9% and increased the amount the U.S. government reimburses for Remicade by more than $190 per infused dose. J&J's list price increases are not overcome by increased rebates and discounts: Remicade's "average selling price" ("ASP")—which by federal law is an average of a drug's pricing after taking into account discounts, rebates, and other price concessions—has actually *increased* since Inflectra's entry. Specifically, between 2007 and 2017, Remicade's ASP increased more than 62%.

14.     As of September 2017, Remicade's ASP was more than 10% higher than Inflectra's ASP.

15.     Despite Inflectra's lower per-unit prices, including a promise by Pfizer to guarantee clients that Inflectra would be less expensive unit-for-unit than Remicade during a contract term, and J&J's escalating prices, Remicade has not lost any substantial volume or share of sales to Inflectra.

16.     In July 2017, J&J extolled the success of its monopoly maintenance scheme, noting that it had not "seen much of an impact" from Inflectra's entrance, and that J&J is

"especially well-prepared to manage through the Remicade biosimilars."[7] J&J also said it was confident that it could fend off even subsequent biosimilar entrants because of its exclusionary contracts: "[W]e have our contracting in place with all the managed care organizations [e.g., health insurers]."[8] The net result is that healthcare providers, such as Plaintiff and Class Members, and patients have fewer choices and pay more than they should for Remicade.

17.    To correct the unfair playing field and higher prices caused by J&J's anticompetitive conduct, Plaintiff brings this action under the antitrust laws of the United States and various states and under the consumer protection laws of various states. If J&J's conduct is allowed to continue, its "Biosimilar Readiness Plan" will become the playbook for biologic originator firms seeking to preserve their dominance in the face of biosimilar competition—thus subverting the competition-enhancing objectives of the Biologics Price Competition and Innovation Act of 2009 ("BPCIA").

## THE PARTIES

18.    Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York, 11590. Local 1500 provides nearly 23,000 members with health and welfare benefits, many of whom live in New York, among other states. During the Class Period, Local 1500 purchased and paid for some or all the purchase price of Remicade, thereby suffering injury to its business and property. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct.

---

[7] Johnson & Johnson, Q2 2017 Results Earnings Call Transcript (July 18, 2017), available at https://seekingalpha.com/search/transcripts?term=johnson+%26+Johnson+biosimilar.

[8] *Id.*

19.     Defendant Johnson & Johnson is a corporation organized and existing under the laws of New Jersey. Johnson & Johnson's principal place of business in the United States is located at One J&J Plaza, New Brunswick, New Jersey, 08933. Johnson & Johnson is an international pharmaceutical company—one of the largest in the world—and was the sole supplier of infliximab, marketed as Remicade, between 1998 and 2016, when Inflectra came to market.

20.     Defendant Janssen Biotech, Inc. ("Janssen") is a wholly-owned subsidiary of Johnson & Johnson. Janssen is a corporation organized and existing under the laws of Pennsylvania. Janssen's corporate headquarters are located at 800 Ridgeview Drive, Horsham, Pennsylvania, 19044. Janssen co-owns or has licenses to the Remicade patents and performs the marketing for Remicade in the United States.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

21.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiff and other members of the Injunctive Class have suffered from Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

22.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. §26, because this action arises under federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367(a).

23.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000, and at least one member of the putative class is a citizen of a state different from that of one of Defendants.

24.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. §22, because, during the Class Period, Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

25.    Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

26.    During the Class Period, Defendants manufactured, sold, and shipped Remicade in a continuous and uninterrupted flow of interstate and intrastate commerce. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on both intrastate and interstate commerce.

## FACTUAL AND REGULATORY BACKGROUND

**A.    The Market for Biologics and Biosimilars**

27.    Many of today's important medications are biological products. Biologics encompass a wide range of products, including "vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and recombinant therapeutic proteins."[9] They can be composed of sugars, proteins, or nucleic acids, or combinations of these substances, or may even be living cells and tissues. They are derived from a variety of natural sources—human,

---

[9] FDA, What Are "Biologics" Questions and Answers, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CBER/ucm133077.htm.

animal, or microorganism.[10] Biologics are used to treat a range of diseases including cancer, rheumatoid arthritis, diabetes, and anemia.

    28.    Biologic products are often far more complex than small-molecule drugs. For instance, aspirin, a common small-molecule drug, is made of up only 21 atoms, while infliximab, on the other hand, consists of more than 20,000 atoms. The chemical structures below demonstrate the disparity in size and complexity between small-molecule drugs (e.g., aspirin) and biologic products (e.g., infliximab)[11]:



**Aspirin**
($C_9H_8O_4$)

**Infliximab**
($C_{6428}H_{9912}N_{1694}O_{1987}S_{46}$)

    29.    Due to their complexity, biologics are generally more challenging and expensive to produce than small-molecule generic drugs. Because products containing living cells are sensitive to their environments, in order to produce a product that is sufficiently similar to the reference product, a biosimilar manufacturer must create unique processes to manipulate the

---

[10] FDA, What Are "Biologics" Questions and Answers, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CBER/ucm133077.htm.

[11] *See* UCLA, "Illustrated Glossary of Organic Chemistry", http://www.chem.ucla.edu/~harding/IGOC/A/aspirin.html; Drug Bank, https://www.drugbank.ca/drugs/DB00065.

cells. Further, slight variations in the chemical structure of each biosimilar make it more challenging to achieve consistent clinical study results.

30.    Due to these more complex development and testing issues, biosimilars are typically priced at less of a discount to pioneer biologics than are generic drugs to brand drugs. Nevertheless, as healthcare costs continue to rise, biosimilars offer significant cost savings opportunities for drug purchasers, insurers, and consumers.[12] An FTC study found that biosimilars can be as much as 30% cheaper than pioneer biologics.[13] Studies on the effects of biosimilar competition in Europe suggest that pioneer biologic manufacturers also reduce prices on their own products in the face of biosimilar competition. One biosimilar developer projected that biosimilars could generate $250 billion in savings to consumers over ten years.[14]

**B.    Congress Enacted the Biologics Price Competition and Innovation Act to Spur Price Competition for Biologic Medications**

31.    In the United States, pharmaceutical companies seeking approval to market biologic products must file a Biologic License Application ("BLA"). The BLA must include certain data demonstrating, among other things, the proposed product's therapeutic properties, as well as the product's conformity with FDA requirements on safety, purity, and potency.[15]

---

[12] Federal Trade Comm'n, Emerging Health Care Issues: Follow-On Biologic Drug Competition; A Federal
Trade Commission Report 47, 53 (June 2009),
https://www.ftc.gov/sites/default/files/documents/reports/emerging-health-care-issues-follow-biologic-drug-competition-federal-trade-commission-report/p083901biologicsreport.pdf.

[13] *Id.*

[14] *See* Sumant Ramachandra, Senior V.P., Hospira, Presentation, Lessons for the United States: Biosimilar Market Development Worldwide (Feb. 4, 2014), https://www.ftc.gov/news-events/events-calendar/2014/02/follow-biologicsworkshop-impact-recent-legislative-regulatory,then follow Event Speakers.

[15] 21 C.F.R. § 601.2.

32.     Prior to 2010, there was no clear pathway for "genericized" versions of biologic products to reach the market. However, in March 2010, Congress passed the BPCIA, which provides a pathway for biosimilars to receive FDA approval.[16]

33.     Under the BPCIA, if a manufacturer can demonstrate that its biologic is "highly similar," and has no clinically meaningful differences in terms of safety and effectiveness, to an FDA-approved biological product, also known as a reference product, then it can be approved as a "biosimilar" to the reference product.[17] A pharmaceutical company may file an abbreviated Biologic License Application ("aBLA"), which can rely on the reference product's sponsor's clinical studies to demonstrate that the biosimilar will be safe and effective.

34.     The FDA publishes a list of licensed biological products with reference product exclusivity and biosimilarity evaluations, known as the "Purple Book." Currently, the FDA has approved five biosimilars, with the latest approval being Merck's Renflexis.

35.     As noted above, approved biosimilars offer significant cost savings to drug purchasers, insurers, and consumers over their biologic counterparts. For example, both Inflectra and Renflexis are sold at a discount of between 15% and 35% to the branded biologic Remicade.

## C.     Infliximab

36.     Infliximab is a tumor necrosis factor-inhibiting biologic that is used to treat a range of immune-mediated diseases, including Crohn's disease, ulcerative colitis, rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and plaque psoriasis.[18] Infliximab is an important medicine that has provided life-changing benefits to millions of patients.

---

[16] Pub. L. No. 111-148, 124 Stat. 804 (2010), *codified as* 42 U.S.C. § 262, et seq.

[17] 42 U.S.C. § 262(i)(2)(A)-(B).

[18] US National Library of medicine National Institute of health, "Tumor necrosis factor inhibitors – state of knowledge" (Dec. 22, 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4296073/.

37.    It is a chimeric IgG1κ monoclonal antibody (composed of human constant and murine variable regions) specific for human tumor necrosis factor-alpha. Infliximab is produced by a recombinant cell line cultured by continuous perfusion and is purified by a series of steps that includes measures to inactivate and remove viruses.[19]

38.    Infliximab is an infusion therapy, meaning it is administered intravenously.[20] Thus, in most cases, infliximab patients must visit clinics, hospitals, or other medical facilities to receive the therapy from healthcare professionals. As a result, patients rarely purchase infliximab themselves at retail pharmacies. Instead, infusion centers, clinics, and hospitals purchase infliximab and, after administration, seek reimbursement from the patient's insurer or a government payer (e.g., Medicare) for the treatment.

**D.    J&J's Remicade**

39.    J&J introduced the first infliximab product in the United States in 1998, under the brand name Remicade.[21]

40.    An estimated 475,000 patients in the U.S. receive at least one dose of Remicade annually. This fact, combined with the cost (approximately $4,000 per infused dose at list price), makes administering Remicade a major expense item for insurers and healthcare providers.

41.    J&J's list price increases for Remicade and other pricing actions have resulted in consistent increases in Remicade's ASP. For instance, an April 2016 report revealed that

---

[19] FDA, https://www.fda.gov/ohrms/dockets/ac/00/slides/3623s1_01_centocor.PDF.

[20] FDA, https://www.fda.gov/ohrms/dockets/ac/00/slides/3623s1_01_centocor.PDF.

[21] J&J, https://www.jnj.com/media-center/press-releases/remicade-receives-fda-approval-as-first-biologic-treatment-for-pediatric-ulcerative-colitis; http://www.nytimes.com/1998/08/25/science/first-drug-approved-for-crohn-s-disease.html?mcubz=0.

Remicade prices had increased nearly 63% over a five-year period.[22] A J&J spokeswoman disclosed that ASP increases were around 5.4% per year.[23] J&J has increased the price of Remicade without experiencing a loss of sales to other therapies. Instead, Remicade sales have increased steadily since it was introduced. Indeed, J&J's anticompetitive conduct has enabled J&J to continue raising the price of Remicade notwithstanding the arrival of Inflectra and Renflexis.

42.     Since 1998, J&J has reaped billions of dollars in profit from Remicade.[24]

**E.     Purchasing Remicade**

43.     Physician practice groups, group purchasing organizations, hospitals, and infusion centers purchase Remicade either directly from drug companies or through certain authorized specialty pharmacies and wholesalers. These healthcare providers rely on subsequent reimbursement from insurers to recoup their expenses.

44.     Similarly, patients depend on reimbursement from insurers for their Remicade treatments and would face enormous out-of-pocket costs should they opt for a Remicade biosimilar that was not covered by their insurers.

45.     Health and welfare funds that provide medical and pharmaceutical benefits for employees and their dependents also provide reimbursement for some, or all, of the purchase price of its members' Remicade purchases.

---

[22] Reuters, "Exclusive: Makers took big price increases on widely used U.S. drugs" (Apr. 4, 2016), https://www.reuters.com/article/us-usa-healthcare-drugpricing/exclusive-makers-took-big-price-increases-on-widely-used-u-s-drugs-idUSKCN0X10TH.

[23] *Id.*

[24] *Id.*

**F.    Remicade Biosimilars: Inflectra and Renflexis**

46.    As noted above, there are currently two biosimilars to Remicade available on the market: Pfizer's Inflectra and Merck's Renflexis.

47.    ***Inflectra:*** Inflectra was developed through a partnership between Pfizer and another biopharmaceutical company, Celltrion. Together they filed an aBLA in 2014. Following that aBLA filing, J&J sued Pfizer and Celltrion for patent infringement. On August 17, 2016, Judge Wolf of the District of Massachusetts ruled that J&J's patent was invalid.[25] Moreover, a few months after the District Court's ruling, the U.S. Patent and Trademark Office issued a final decision in a re-examination proceeding about the same patent: it, too, concluded that J&J's patent was invalid.[26]

48.    While the patent litigation and re-examination was underway, the FDA approved Pfizer's Inflectra on April 5, 2016 for the following indications:  Crohn's disease, pediatric Crohn's disease, ulcerative colitis, rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, and plaque psoriasis. Remicade is also approved for pediatric ulcerative colitis—a tiny component of the market for the drug. J&J's Remicade possesses marketing exclusivity over this indication until 2018.

49.    In the FDA press release announcing the approval, the director of FDA's Center for Drug Evaluation and Research reiterated that approval of a biosimilar reflects a determination of "no clinically meaningful differences" from the originator, and stated that "[p]atients and the

---

[25] http://www.reuters.com/article/us-johnson-johnson-patent/jj-says-court-finds-remicade-patent-invalid-idUSKCN10S26J.

[26] *Id.*

health care community can be confident that biosimilar products are high quality and meet the agency's rigorous scientific standards."[27]

50.     Pfizer began selling Inflectra in November 2016.[28]

51.     **Renflexis:** Renflexis was developed by the South Korean company, Samsung Bioepsis, and is marketed in the United States by Merck under a "global biosimilars development and commercialization agreement" between the companies.[29] Samsung Bioepsis filed its aBLA on March 21, 2016. J&J filed patent litigation against Samsung in New Jersey federal court in May 2017 based on the filing of the aBLA.[30]

52.     The FDA approved Samsung's aBLA on April 21, 2017 for the following indications: Crohn's disease, pediatric Crohn's disease, ulcerative colitis, rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, and plaque psoriasis. Like, Inflectra, Renflexis has not been approved for pediatric ulcerative colitis due to J&J's marketing exclusivity over that indication.

53.     Merck began selling Renflexis in July 2017.

---

[27] *See* U.S. Food & Drug Administration, *FDA Approves Inflectra, A Biosimilar* to Remicade (Apr. 5, 2016), https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm494227.htm.

[28] Pfizer, "Pfizer Announces the U.S. Availability of Biosimilar Inflectra (Infliximab-dyyb)" (Oct. 17, 2016), http://www.pfizer.com/news/press-release/press-release-detail/pfizer_announces_the_u_s_availability_of_biosimilar_inflectra_infliximab_dyyb; Reuters, "Pfizer to start shipping biosimilar version of J&J's Remicade in November" (Oct. 17, 2016), http://www.reuters.com/article/us-pfizer-biosimilar/pfizer-to-start-shipping-biosimilar-version-of-jjs-remicade-in-november-idUSKBN12H2FZ.

[29] *See* Merck Press Release, *supra* note 4.

[30] *See* Reuters, "Janssen files suit in U.S. to block sale of Samsung Bioepis' Remicade copy" (May 18, 2017), https://www.reuters.com/article/us-johnson-johnson-samsung-bioepis-lawsu/janssen-files-suit-in-u-s-to-block-sale-of-samsung-bioepis-remicade-copy-idUSKCN18F09G.

**G.      Inflectra and Renflexis Are Lower-Cost Alternatives to Remicade**

54.      Pfizer introduced Inflectra with a list price 15% lower than Remicade's.[31] Pfizer has represented that it subsequently offered substantial additional pricing concessions to insurers and providers in the form of discounts and/or rebates that in some instances were more than 40% below Inflectra's list price. The goal and effect was to offer Inflectra for less than the price J&J was offering Remicade.

55.      Given Inflectra's lower price, Pfizer was optimistic that it would have an opportunity to compete, to secure a reasonable share of the business, particularly for new patients, and to bring the benefits of price competition to consumers, providers, insurers, and the U.S. government. However, due to J&J's exclusionary conduct, competition has been foreclosed. J&J has maintained its monopoly and has continued to capture over 96 percent of infliximab sales even while maintaining prices far above competitive levels.[32] In fact, Pfizer's Group President for Pfizer Essential Health, John Young, reported to stakeholders that by the end of June 2017, "our Inflectra share was 2.3% of the overall infliximab volume," including both patients who had not used infliximab before and those who switched to Inflectra.[33]

56.      Like Inflectra, Renflexis was sold at a significant discount to Remicade. When Merck began selling Renflexis in July 2017, it announced that it would sell Renflexis at a 35% discount to Remicade's list price.

---

[31] http://www.pfizer.com/news/press-release/press-release-detail/pfizer_announces_the_u_s_availability_of_biosimilar_inflectra_infliximab_dyyb; https://pharmaintelligence.informa.com/resources/product-content/payers-want-deep-discounts.

[32] *See* https://biosimilarsrr.com/2017/08/04/inflectra-sales-lagging-for-pfizer-in-second-quarter/.

[33] Q2 2017 Pfizer Inc. Earnings Call Transcript, https://s21.q4cdn.com/317678438/files/PFE-USQ_Transcript_2017-08-01.pdf (August 1, 2017).

**H.    The Importance of Insurance Coverage for Infliximab**

57.    Most patients who are prescribed Remicade have some form of insurance coverage or qualify for patient assistance. Generally, the sources of insurance coverage are (a) private insurance, accounting for about 60% of patients nationally and (b) government insurance programs (principally Medicare and Medicaid), accounting for the remaining 40%. Insurance coverage and reimbursement are therefore key to the adoption of the product by patients and healthcare providers alike. If the cost of a product as expensive as Remicade is not widely covered, it will not be significantly utilized.

58.    Because Remicade is not dispensed in a retail pharmacy, but rather is administered intravenously in a clinic or other institutional setting, it generally is not included under the "pharmacy benefit" of most health plans. In the pharmacy benefit setting, physicians prescribe a drug and the patient purchases the medication at the pharmacy, paying for it with a combination of insurance coverage (either private or government-sponsored) and out-of-pocket payment (usually, a co-pay).[34] Thus, neither the prescribing physician nor the institution with which the physician is affiliated bears financial risk with respect to the drug selected, i.e., the drug is not purchased and stocked in advance by providers at their own cost. The pharmacy buys the drug, dispenses it, and is reimbursed.

59.    In contrast, "medical benefit" products such as Remicade are administered at a clinic or other healthcare provider site,[35] and the provider *itself* first purchases the drug product for use in the infusion treatment of patients, and then later seeks reimbursement for the drug

---

[34] *See* https://www.remicade.com/; https://www.janssencarepath.com/sites/www.janssencarepath.com/files/remicade-physician-plan-of-treatment-for-infusion-site-referral-form.pdf?v=166; https://www.janssencarepath.com/hcp/remicade/reimbursement/forms-documents.

[35] https://www.janssencarepath.com/sites/www.janssencarepath.com/files/remicade-billing-guide.pdf?v=156.

from a third-party payer (a practice commonly referred to as "buy and bill"). When a treatment is administered, the provider must secure payment for the service, including the cost of the product dispensed (which the provider had to pay up front with its own funds). In this context, the provider has a strong interest in utilizing drugs that are widely covered by insurance, particularly by the major national commercial health insurers and significant regional insurers active in its area. If a drug product is not widely covered, such that there is a risk that coverage might be denied, providers are much less likely to purchase that product due to the fact that they could be burdened with a financial loss.

60.     Commercial insurers typically publish medical policies enumerating the drug products they will cover under the medical benefit and the terms under which they will do so. For example, medical policies may exclude drugs from coverage, or they may dictate restrictions on use. Drug manufacturers compete, usually with rebates or other price concessions, to obtain coverage under insurer medical policies and to have either fewer restrictions on reimbursement than their competitors—or, at a minimum, to achieve "parity" whereby the competing products have the same restrictions on reimbursement and the patient or doctor can choose between them. Securing at least parity placement is critical, especially for new products seeking to gain traction in the marketplace, and particularly with large insurers, which have tens of millions of covered patients.

## J&J'S UNLAWFUL EXCLUSIONARY SCHEME

61.     Not content with its nearly two full decades of exclusivity with Remicade, and its resulting billions of dollars of profits, J&J hatched a multifaceted scheme to ensure that biosimilars would never become viable competitors—a scheme embodied, at least in part, in its

"Biosimilar Readiness Plan." J&J revealed the existence of, and some details about, the plan during a recent investor call and presentation.[36]

62.    As explained to the public, J&J plotted to attack competitors on the patent front and through the J&J sales force. First, despite the fact that Pfizer had successfully challenged J&J's Remicade patent at the trial court level, J&J attempted to tie Pfizer up by initiating a lengthy patent appeals process. Second, J&J employed a significant sales force to preach the superiority of Remicade's lengthy scientific track record in an attempt to prevent any new biosimilars from making inroads in the market. One J&J consultant bragged at a recent health conference that his firm helped design the plan to realize J&J's goal of ensuring that biosimilars never gain a foothold in the market.

63.    However, what was left undisclosed to the public was that J&J was also undertaking additional tactics to thwart competition to Remicade. These tactics included entering into exclusionary contracts with nearly all national health insurers, coupled with coercive rebate policies and anticompetitive bundling, that were designed to block both insurers from reimbursing, and hospitals and clinics from purchasing, Remicade biosimilars, despite their lower prices.

64.    J&J's conduct has not gone unnoticed in the industry. For example, an analyst at a prominent securities firm (Bernstein Research) recently summarized key aspects of J&J's scheme, observing that J&J has: (a) "negotiated with [insurers]" and set up "exclusive contracts . . . in nearly half the market," thereby making providers unwilling to purchase Inflectra; (b) "offered up deeper discounts to large independent infusion centers [i.e., major providers], which are more economically sensitive"; and (c) "bundled several drugs and medical devices [together]

---

[36] Johnson & Johnson, Q3 2016 Results Earnings Call Transcript (Oct. 14, 2016), available at https://seekingalpha.com/search/transcripts?term=johnson+%26+Johnson+biosimilar.

for larger hospitals."[37] The analyst also noted that a key to J&J's strategy was the "long 'tail' of [patients] remaining on the brand,"[38] which gives J&J leverage to extract commitments from insurers not to cover Remicade biosimilars such as Inflectra and Renflexis.

65.    Another industry observer, commenting on the Bernstein survey, noted that J&J's "fail first" requirements with insurers, described below, "force hospitals and clinics to buy Remicade." The observer also noted that:

> J&J has had yet another advantage—an ability and willingness to bundle different medicines as part of a package deal. By offering discounts and rebates for several drugs, J&J can secure contracts and crowd out rivals. And discounts are also appealing to physicians who run their own infusion centers.[39]

## A.    J&J Bars Access to Insurer Reimbursement through Pure Exclusion Contracts and Fail First Contracts

### 1.    J&J's Pure Exclusion Contracts

66.    A centerpiece of J&J's strategy to block biosimilar competition has been to secure contractual commitments from commercial insurance companies to exclude biosimilars from coverage under their plans entirely, making Remicade the exclusive infliximab product available to patients covered by those plans. According to Pfizer, J&J has imposed restrictive contracts on insurers that required them simply to exclude biosimilars from their medical policies and/or drug formularies altogether.

67.    While exclusive contracts are, in certain circumstances, appropriate, the exclusivity provisions described herein serve no legitimate or procompetitive purpose and were not earned through genuine price competition. After Inflectra's FDA approval in April 2016, and

---

[37] Aaron Gal, *Biosimilars: So, Why Has Remicade Biosimilar Not Gotten Much Traction in the U.S.*, Bernstein Research, at 1 (July 20, 2017).

[38] *Id.*

[39] Ed Silverman, *J&J Now Has Two Competitors for A Pricey Blockbuster. Will That Finally Drive Down Prices?*, Stat News (July 25, 2017), https://www.statnews.com/pharmalot/2017/07/25/merck-samsung-biosimilar-pfizer-johnson/.

before J&J implemented its exclusionary contracts, health insurers participated in reviews to determine whether there was a medical reason not to reimburse Inflectra or to disfavor it relative to other therapies. Following these reviews, several major health insurance companies— including Aetna, Anthem, and UnitedHealthcare—classified Inflectra at *parity* with Remicade. This confirmed that there was no medical reason justifying a restrictive reimbursement policy toward Inflectra. It also meant that, for the time being, Inflectra would be reimbursed without restriction. As a result, the stage was set for Inflectra to begin competing head-to-head with Remicade on a level playing field—and for healthcare providers and patients to begin receiving the benefits of greater choice and lower prices.

68.     But this initial state of affairs was short lived. As a result of J&J's anticompetitive conduct, insurers began to reverse course and restrict coverage of Inflectra.

### 2.    J&J's Fail First Contracts

69.     Other J&J contracts have also imposed a spurious requirement that the biosimilar could be reimbursed only after a patient first tried and failed on Remicade (the "fail first" requirement). This conduct virtually ensures that the biosimilar will never be prescribed and never be reimbursed. If a patient fails on Remicade, it would defy sound medical judgment for a physician to switch to a therapeutically equivalent biosimilar, which works in exactly the same way, rather than another therapy, to which a patient may potentially respond differently. This has recently been reinforced in the European League Against Rheumatism rheumatoid arthritis management recommendations. In those recommendations, "The Task Force reiterated its

position that if a TNF-inhibitor fails, another TNF-inhibitor—but not a biosimilar of the same

molecule!-can be as effective as changing the mode of action."[40]

70.     For example, in October 2016, UnitedHealthcare, the nation's largest health

insurer, with over 30 million covered commercial medical patients, published an update to its

medical and site of care policies classifying Inflectra at parity with Remicade for the approved

indications (with an effective date of November 1, 2016).  This meant that UnitedHealthcare

would freely reimburse Inflectra, and it would not be disfavored relative to Remicade. However,

according to Pfizer, UnitedHealthcare reversed course just weeks later. Specifically,

UnitedHealthcare classified Remicade as its "preferred" product, and instructed that Inflectra

would be eligible for reimbursement only in circumstances so limited as to be practically non-

existent.

71.     Under UnitedHealthcare's new policy, Inflectra could be reimbursed only where

the following conditions are met: (a) the patient must show a minimal clinical response, or an

intolerance or adverse reaction, to Remicade; (b) the physician must attest that Inflectra would

not lead to the same adverse responses; and (c) the patient must show no loss of favorable

response in established maintenance therapy with Remicade, and must not have developed

neutralizing antibodies to any infliximab biosimilar product that has made the therapy less

effective. As a practical matter, this meant that Inflectra would not be reimbursed for

UnitedHealthcare's more than 30 million commercial medical members, and that Remicade

would be the exclusive infliximab with UnitedHealthcare despite the lack of any medical basis

for denying those members access to a lower-priced alternative. Consequently, healthcare

---

[40] Smolen, J.S., et al., *EULAR Recommendations for the Management of Rheumatoid Arthritis with Synthetic and Biological Disease- Modifying Antirheumatic Drugs: 2016 Update*, Annals of the Rheumatic Diseases 2017:0:1-18 (Mar. 6, 2017).

providers were forced to pay inflated prices for Remicade in these instances where they would not be reimbursed for purchases of Inflectra.

72.    According to Pfizer, J&J has induced most major health insurers, covering at least 70% of commercially insured patients in the United States, to adopt these improper "fail first" contractual exclusivity restrictions. These insurers include (in decreasing order of patients covered):

**National insurers:**

(a)    *UnitedHealthcare*: UnitedHealthcare adopted the "fail first" requirement. UnitedHealthcare has approximately 30.6 million covered commercial medical patients across all 50 states.

(b)    *Anthem*: Anthem excluded Inflectra from coverage altogether. Anthem has approximately 30.4 million covered commercial medical patients concentrated in 14 states.

(c)    *Aetna*: Aetna adopted a complex set of indication-specific conditions that operate in practice as "fail first" requirements. Aetna has approximately 17.9 million covered commercial medical patients in all or nearly all states and territories in the United States.

(d)    *Cigna*: Cigna adopted the "fail first" requirement. Cigna has approximately 13 million covered commercial medical patients across all 50 states.

**Regional insurers:**

(a)    *HealthNet (Centene)*: HealthNet adopted a complex set of indication specific conditions that operate in practice as "fail first" requirements. HealthNet (as part of its acquisition by Centene) has approximately 12 million covered commercial medical patients concentrated in 28 states.

(b)    ***CareFirst/Blue Cross Blue Shield***: CareFirst adopted the "fail first" requirement. Indeed, CareFirst agreed with J&J that Inflectra would be non-preferred, meaning it cannot be reimbursed unless there are "clinical circumstances that would exclude the use of . . . preferred products," including Remicade. CareFirst has approximately 3.2 million covered commercial medical patients principally found in Maryland, Virginia, and the District of Columbia.

(c)    ***Blue Cross Blue Shield of North Carolina***: BCBS of North Carolina adopted the "fail first" requirement. BCBS of North Carolina has approximately 2.7 million covered commercial medical patients concentrated in North Carolina.

(d)    ***Blue Cross Blue Shield of Tennessee***: BCBS of Tennessee adopted the "fail first" requirement. BCBS of Tennessee has approximately 1.6 million covered commercial medical patients concentrated in Tennessee.

(e)    ***Blue Cross Blue Shield of Louisiana***: BCBS of Louisiana adopted the "fail first" requirement. BCBS of Louisiana has approximately 1.6 million covered commercial medical patients principally concentrated in Louisiana.

(f)    ***Excellus Blue Cross Blue Shield***: Excellus BCBS adopted the "fail first" requirement. Excellus has approximately 1.2 million covered commercial medical patients concentrated in New York.

(g)    ***Independence Blue Cross***: Independence Blue Cross adopted the "fail first" requirement. Independence Blue Cross is the leading health insurer in Philadelphia.

These contracts alone affect approximately 114 million covered commercial medical patients of the over approximately 214 million patients covered by commercial medical insurance in the United States.

73.    As the following brochure shows, J&J markets the "fail first" requirement as a selling point despite the fact that such a provision is medically inappropriate and despite FDA's determination that there are no clinically meaningful differences between Remicade and Remicade biosimilars. Thus, the brochure touts that Remicade is "Preferred Over Inflectra . . . Inflectra requires trial and failure on Remicade prior to [Inflectra] utilization."[41]

---

[41] Remicade® (infliximab) is the preferred infliximab product":
https://www.uhcprovider.com/content/dam/provider/docs/public/policies/comm-medical-drug/infliximab-remicade-inflectra.pdf.



74.     Such "fail first" provisions disincentivize clinics and hospitals from purchasing Remicade biosimilars, even though they are less expensive and have no clinically meaningful differences in terms of safety and effectiveness. Consequently, even patients whose insurance plans do cover Inflectra have limited access to the drug because nearly all healthcare providers have declined to purchase Inflectra rather than deal with the risk of possible denials of coverage.

**B.      J&J Coerces Insurers to Accept its Exclusive Contracts Through Exclusionary Rebates and Bundling Arrangements**

**1.      Exclusionary Rebates and Bundling Arrangements With Insurers**

75.     J&J's threatened penalties are effective because they leverage the large base of existing patients already stabilized on Remicade. Given that J&J has offered the only infliximab

option in the United States for nearly two decades, its base of existing Remicade patients is substantial, amounting to hundreds of thousands of patients across the country. And, in part driven by J&J's marketing efforts to secure this outcome, existing Remicade patients are likely to stay on Remicade. Thus, the demand for Remicade associated with this existing base of patients is, as a practical and economic matter, incontestable. This is so despite the fact that switching is within the scope of FDA's approval for use of biosimilars and thus appropriate when medically directed.

76.     The situation is different for *new* patients who may be candidates for infliximab. In light of this, Pfizer has focused, among other things, on competing for a substantial share of *new patient starts* (the "contestable" demand) by pricing Inflectra competitively with both insurers and providers on a unit-for-unit basis. The fact that Inflectra's ASP is lower than Remicade's underscores the cost savings it offers.[42] The same is true for Renflexis, which was introduced on the market at a 35% discount to Remicade's list price.

77.     By threatening to withhold attractive rebates on all Remicade prescriptions— including those for existing patients as well as new ones—unless an insurer agrees to exclusivity, J&J is able to leverage the incontestable demand (existing Remicade patients) for Remicade to exclude competition for the contestable demand (new patients), i.e., it bundles the contestable and incontestable demand. For example, even if Pfizer offers a significantly lower price for Inflectra unit-for-unit, as it has done, insurers will agree to J&J's exclusive deals to avoid losing

---

[42] Discount dancers: Pfizer's infliximab matching Merck's new biosimilar rival

By Dan Stanton, 26-Jul-2017 (Pfizer dropped the US price of Inflectra, its version of Johnson & Johnson's Remicade, just weeks before Merck & Co. launched its infliximab biosimilar, Renflexis.); http://www.biopharma-reporter.com/Markets-Regulations/Pfizer-cuts-biosimilar-price-to-match-Merck-s-new-infliximab-rival.

rebates on the substantial base of existing Remicade patients who are not likely to switch to Inflectra despite the presence of the lower-priced biosimilar.

78.    A recent article by two Yale Medical School professors in the *Journal of the American Medical Association* illustrates how the kind of leverage J&J has over existing, stable Remicade patients allows it to extract commitments to exclude biosimilars:[43]

> If a biosimilar manufacturer intends to upend the preferred position of the brand by offering a substantial price discount to the [insurer], the branded manufacturer can respond by withdrawing the rebate on the [branded] biologic, ***creating a "rebate trap."*** For any patient continuing the [branded] biologic, a payer's cost for that patient will double once the rebate is withdrawn . . . . Even in [an] optimistic scenario, in which the price of the biosimilar is 60 percent less than the price of the brand after rebates and discounts, if the payer is only able to convert 50 percent of its patient users to the biosimilar [because existing patients will tend to stay on the original branded product], ***the rebate trap ensures that payer total costs actually increase relative to costs prior to biosimilar availability.***

79.    For example, according to Pfizer, J&J induced UnitedHealthcare to enter into an exclusive deal by threatening to penalize UnitedHealthcare with the loss of significant rebates unless UnitedHealthcare agreed to deny coverage of Inflectra. J&J has allegedly employed the same approach to secure exclusive deals with most or all of the major insurers identified above. In most cases these coercive biosimilar-exclusion contracts were the only economically viable option for insurers—as adopting any alternative would require the insurer to incur a substantial penalty (i.e., foregone rebates to existing Remicade patients) that could not be offset by the per-unit cost savings available on the number of patients likely to use the biosimilar, at least in the near term.

80.    J&J has further insulated its contracts with insurers from competition by bundling rebates for Remicade with rebates on other products in return for commitments not to cover

---

[43] Aaron Hakim & Joseph S. Ross, *Obstacles to the Adoption of Biosimilars for Chronic Diseases*, Journal of the American Medical Association (May 1, 2017), available at http://jamanetwork.com/journals/jama/article-abstract/2625049.

Inflectra. J&J made it no secret that it would leverage other products in conjunction with its "Biosimilar Readiness Plan." As J&J's Worldwide Chair for Pharmaceuticals made clear on a recent earnings call, "We are fully prepared to execute our focused biosimilar readiness plan," including "developing innovative contracts . . . [to] utilize the full breadth of our portfolio."[44] The "full breadth of [J&J's] portfolio" includes several drugs for which Pfizer does not offer any directly competing alternative. These include drugs such as Simponi (used for rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and ulcerative colitis), Simponi Aria (used for rheumatoid arthritis), and Stelara (used for plaque psoriasis, psoriatic arthritis, and Crohn's disease). These products are widely used, with Simponi and Simponi Aria generating approximately $1.7 billion in 2016 for J&J and Stelara generating approximately $3.2 billion in 2016 for J&J. J&J has threatened insurers with the loss of rebates on these other drugs, as well as Remicade, if they do not agree to exclude Inflectra from coverage.

### 2.    Exclusionary Rebates and Bundling Arrangements With Providers

81.    J&J has also used multi-product bundling in its provider-level contracts. As one analyst reported, "J&J bundled several drugs and medical devices for larger hospitals, making Inflectra less economical."[45] Conditioning rebates linked to *other* J&J products upon a promise not to do business with Inflectra only exacerbates the exclusionary nature of J&J's contracts.

82.    After Inflectra's introduction, J&J began offering certain large providers additional rebates and/or discounts on Remicade but *only* if the provider committed to buy Remicade for nearly all of its infliximab needs. To be eligible for rebates, J&J required providers to maintain purchase levels for Remicade at very close to the levels of the year *before* Inflectra's

---

[44] Johnson & Johnson, Q3 2016 Results Earnings Call Transcript (Oct. 14, 2016), available at https://seekingalpha.com/search/transcripts?term=johnson+%26+Johnson+biosimilar.

[45] Gal, *supra* note 38, at 1.

launch—when Remicade was the only infliximab option.[46] According to one Bernstein analyst, "Providers were forced to stock Remicade and as provider discounts are volume dependent, there was a broad preference for the brand."

83.    Like its insurer-level contracts, these contracts as a practical matter make Remicade the exclusive infliximab with the participating providers.

84.    According to Pfizer, it was and is prepared to negotiate with providers to make Inflectra the lower-priced infliximab option on a per-unit basis and has even offered to guarantee that Inflectra would be less expensive unit-for-unit than Remicade. But, as with insurer contracts, to secure the right to deal freely as to Inflectra (i.e., principally as to new patients), the providers would lose significant J&J rebates on their existing Remicade patient bases.

## C.    Effects of J&J's Exclusionary Agreements

85.    Regardless of their specific form, these contracts all had the same purpose: to exclude biosimilars from coverage and (as one analyst recently confirmed) grant an "exclusive" to Remicade.[47] J&J's multi-product bundling, along with its bundling of contestable demand and incontestable demand, have amplified the anticompetitive effects of J&J's exclusive contracts, and made the exclusivity provided by those contracts even more durable. According to Pfizer, insurers have made it clear that its net cost for Inflectra would need to be low enough to offset the loss of J&J rebates. But, because of the combined effect of these bundles, biosimilar competitors cannot offset the financial penalties that J&J threatens to impose on insurers who do not agree to exclusivity.

---

[46] http://www.fiercepharma.com/pharma/what-s-behind-johnson-johnson-s-successful-remicade-defense-and-can-it-last.

[47] Gal, *supra* note 38, at 1.

86.     J&J's insurer-level contracts further deter hospitals and clinics from purchasing competing biosimilars, thus amplifying foreclosure. Providers are unwilling to stock a drug product where there is significant uncertainty about whether it will be reimbursed by health insurers; because they administer infliximab onsite, providers must expend funds for the product in the first instance, then seek reimbursement after providing treatment. The provider may be able to collect from the patient where coverage is denied, but the prospect of securing payment in full from the patient is bleak, especially for drugs as costly as Remicade. As a result, where a significant portion of a provider's patients are insured by plans that have agreed to exclude Inflectra and other biosimilars—pursuant to the types of contracts described above and herein— the provider is unlikely to offer competing biosimilars for any of its patients, to avoid being caught with no reimbursement.

87.     As a recent article in *Bloomberg* stated:

> Ascension Health, a nearly 23,000-bed nonprofit hospital system based in St. Louis, spends $55 million a year on Remicade, more than any other drug. Using Inflectra, part of a new class of medicines called biosimilars, would save it at least $10 million annually, according to Ascension's chief pharmacist, Roy Guharoy. He met with Pfizer and planned to integrate Inflectra into care more often until learning that insurers preferred to stay with Remicade. "This we did not expect," Guharoy said. "If the insurance companies force us to use the branded product, of course our hands are tied."[48]

In short, provider purchases are driven by the coverage stated by commercial insurers.

88.     Given the widespread gaps in Inflectra's insurance coverage caused by J&J, providers using infliximab have overwhelmingly chosen to stock only Remicade rather than deal with the risk of possible denials of coverage for Inflectra. Thus, providers have declined to purchase Inflectra across the board, even for patients covered by commercial or government

---

[48] Jared S. Hopkins, *What's Harder Than Making Copycat Biotech Drugs? Selling Them*, Bloomberg (Aug. 15, 2017).

insurance plans that *do* cover the product. Indeed, as of September 1, 2017, about *90 percent* of healthcare provider accounts using infliximab have purchased *no Inflectra at all*.

89.    As a result of J&J's monopolistic conduct, biosimilar competitors are economically prohibited from competing on a level playing field. Moreover, J&J can use the same bundling strategies to ensure continuation of the exclusionary pattern by acclimating all stakeholders—insurers, providers, and patients—to reflexively select Remicade over all other competing products, even if those products are sold at significantly lower prices.

## J&J HAS MONOPOLY POWER IN THE RELEVANT MARKET

90.    To the extent that Plaintiff and Class Members may be required to prove market power circumstantially by first defining a relevant product market, Plaintiff and Class Members allege that the relevant product market is the market for infliximab products (the "Infliximab Market"). This market presently consists of three competing products: Remicade, Inflectra, and Renflexis. As alleged in this Complaint, infliximab is a unique biologic compound, which is approved for the treatment of rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, ulcerative colitis, Crohn's disease, and plaque psoriasis.

91.    Infliximab is sold primarily to hospitals and clinics and is almost never stocked by retail pharmacies (only rarely being stocked by certain specialty pharmacies). After administering the infusion treatments to their patients, the hospitals and clinics seek reimbursement from the patients' insurers or government payers. Infliximab products are close substitutes. For example, J&J considers Remicade and FDA-approved biosimilars to be substitutes. This is evidenced by J&J's own marketing materials, which focus on comparisons of price and clinical effectiveness between Remicade and infliximab biosimilars. They do not reference any other therapies, and J&J's "Biosimilar Readiness Plan" similarly ignores other therapies, focusing instead on the unique competitive threat posed by biosimilars. Pfizer's and

Merck's marketing materials similarly compare their products to Remicade, rather than other therapies.

92.    J&J has and continues to maintain monopoly power over the Infliximab Market. At all relevant times, J&J had and exercised the power to exclude and restrict competition in the Infliximab Market. Even with the entry of competing biosimilars, J&J has continued to capture over 96% of infliximab sales, while maintaining prices far above competitive levels. The existence of non-Remicade medications did not constrain J&J's ability to raise Remicade prices without losing substantial sales, and therefore those other drug products are not in the same relevant antitrust market with Remicade.

93.    Functional similarities between Remicade and non-infliximab products are insufficient to permit inclusion of those other products in the Infliximab Market with Remicade. To be an economic substitute for antitrust purposes, a functionally similar product must exert sufficient pressure on the prices and sales of another product, so that the price of that other product cannot be maintained at supracompetitive levels. No other products apart from biosimilar versions of Remicade could have taken away sufficient sales from Remicade to prevent J&J from raising or maintaining the price of Remicade at supracompetitive levels.

94.    At all relevant times, there were high barriers to entry with respect to competition in the Infliximab Market. Substantial barriers to entry exist to developing other infusion-administered drug therapies for autoimmune inflammatory diseases generally, and infusion-administered TNF inhibitors specifically. The development of a new therapy requires tens if not hundreds of millions of dollars and substantial risk, as any new product must survive years of research and development, clinical trials, and FDA approval. If left unchecked, J&J's conduct will serve as an additional barrier to entry, as potential new entrants will recognize that they will

be unable to break J&J's "rebate trap" and thus unable to profitably enter the Infliximab

Market—and consequently will not invest the resources necessary to develop biosimilars.

95.    The relevant geographic market is the United States of America.

## ANTITRUST IMPACT

96.    During the relevant period, Plaintiff and Class Members purchased, paid, or

provided reimbursement for some or all of the purchase price of Remicade. As a result of J&J's

illegal conduct, Plaintiff and Class Members have paid, and will continue to pay, artificially

inflated prices for Remicade. The prices paid were substantially higher than the prices that

Plaintiff and Class Members would have paid absent the illegal conduct alleged in this

Complaint.

97.    As a consequence, purchasers of Remicade have sustained injury to their business

and property in the form of overcharges—and their losses continue to date. The full amount,

forms, and components of such damages will be calculated after discovery and upon proof at

trial.

98.    Defendants' efforts to restrain competition in the Infliximab Market has

substantially affected interstate commerce—and continues to do so.

99.    Defendants' anticompetitive conduct enabled J&J to charge Plaintiff and Class

Members in the United States prices in excess of what they otherwise would have been able to

charge absent its unlawful actions.

100.    The prices that J&J charged in the United States were inflated as a direct and

foreseeable result of its anticompetitive conduct.

101.    The inflated prices that Plaintiff and Class Members have paid for Remicade, and

continue to pay, are traceable to and the foreseeable result of, the overcharges by J&J.

## CLASS ALLEGATIONS

102.    Plaintiff brings this action on behalf of itself and, under Rule 23(a) and (b)(2), of

the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the

following class (the "Injunctive Class"):

> All persons and entities in the United States, who purchased, paid
> and/or provided reimbursement for some or all of the purchase
> price of Remicade during the period beginning at least as early as
> April 5, 2016 and continuing through the present.

> Excluded from the class are: (a) defendants, their officers,
> directors, management, employees, subsidiaries, and affiliates; (b)
> all federal and state governmental entities except for cities, towns
> or municipalities with self-funded prescription drug plans; (c) all
> persons or entities who purchased Defendants' Remicade for
> purposes of resale or directly from Defendants; (d) fully insured
> health plans (*i.e.*, health plans that purchased insurance covering
> 100% of their reimbursement obligation to members); (e) any "flat
> co-pay" consumers whose purchases of Defendants' Remicade
> were paid in part by a third-party payor and whose co-payment
> was the same regardless of the retail purchase price; and (f) any
> judges or justices involved in this action and any members of their
> immediate family.

103.    Plaintiff also brings this action under Rule 23(b)(3), seeking damages on behalf of

the following class (the "Damages Class"):

> All persons and entities in the United States, who purchased, paid
> and/or provided reimbursement for some or all of the purchase
> price of Remicade during the period beginning at least as early as
> April 5, 2016 and continuing through the present, in the District of
> Columbia or any of the following states: Alabama, Arizona,
> California, Hawaii, Iowa, Maine, Michigan, Minnesota, Nebraska,
> Nevada, New Hampshire, New Mexico, New York, North
> Carolina, North Dakota, Oregon, South Dakota, Tennessee,
> Vermont, West Virginia, or Wisconsin.

> Excluded from the class are: (a) Defendants, their officers,
> directors, management, employees, subsidiaries, and affiliates; (b)
> all federal and state governmental entities except for cities, towns
> or municipalities with self-funded prescription drug plans; (c) all
> persons or entities who purchased Remicade for purposes of resale
> or directly from Defendants; (d) fully insured health plans (*i.e.*,

> health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Remicade were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate family

104.     Members of both Classes are so numerous that joinder is impracticable. Plaintiff believes that the Classes number in the hundreds at least and are geographically spread across the nation. Further, the Classes are readily identifiable from information and records in the possession of the Defendants.

105.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes were damaged by the same wrongful conduct by the Defendants, i.e., they paid artificially inflated prices for Remicade and were deprived of the benefits of competition from less-expensive biosimilar versions of Remicade as a result of the Defendants' wrongful conduct.

106.     Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the Classes.

107.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation involving the pharmaceutical industry.

108.     Questions of law and fact common to the members of the Classes predominate over questions, if any, that may affect only individual class members, because the Defendants have acted on grounds generally applicable to the entire class. Such generally applicable conduct is inherent in the Defendants' wrongful conduct.

109.     Questions of law and fact common to the Classes include:

(a)     Whether Defendants engaged in conduct to stifle competition from biosimilar versions of Remicade in the United States;

(b)     Whether Defendants' conduct harmed competition in the Infliximab Market;

(c)     Whether Defendants' activities alleged herein have substantially affected interstate and intrastate commerce;

(d)     Whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and members of the Classes in the form of overcharges on products purchased;

(e)     The amount of overcharges paid by Plaintiff and members of the Classes in the aggregate; and

(f)     The injunctive and other equitable relief needed to end Defendants' restraints and to restore competition in the Infliximab Market.

110.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

111.    Plaintiff knows of no difficulty to be encountered in maintaining this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of 15 U.S.C. § 2**
**Monopolization of All Relevant Markets**

112.    Plaintiff incorporates the preceding paragraphs by reference.

113.    J&J has monopolized the Infliximab Market in violation of Section 2 of the Sherman Act.

114.    J&J has monopoly power in the Infliximab Market.

115.    Through the scheme described above, and other conduct likely to be revealed in discovery, J&J has willfully and unlawfully maintained and enhanced its monopoly power in violation of Section 2 of the Sherman Act. J&J's scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

116.    J&J's scheme has stifled competition in the Infliximab Market and thwarted Congress's purpose in enacting the BPCIA.

117.    Even if price were deemed to be the clearly predominant means by which competition is dangerously likely to be foreclosed, when the total amount of discounts and rebates that J&J offers to insurers and providers under the contracts described in this Complaint, including multi-product bundling arrangements, is attributed to the portion of Remicade sales that is contestable by a biosimilar like Inflectra, J&J is pricing Remicade below its own average variable cost.

118.    There are no legitimate business justifications for J&J's conduct, and any purported legitimate business justifications are mere pretexts.

119.    The purpose and effect of J&J's actions was to block biosimilar drugs from entering the Infliximab Market.

120.    J&J's conduct had the direct effect of foreclosing the U.S. market to biosimilar producers and Plaintiff and Class Members were injured in their business or property as a direct and foreseeable result of J&J's monopoly and predatory practices.

121.    Had J&J competed on the merits instead of unlawfully maintaining its monopoly in the Infliximab Market, Plaintiff and Class Members would have paid substantially lower prices for Remicade or would have had the option of purchasing a lower-cost Remicade biosimilar, like Inflectra or Renflexis. .

122.    Plaintiff and Class Members have suffered harm and are continuing to suffer harm as a result of paying higher prices for infliximab than they would have absent J&J's efforts to arrest competition and maintain its monopoly in the Infliximab Market.

123.    Plaintiff and Class Members have been injured in their business and property in an amount to be established at trial.

124.    Plaintiff and Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 2 of the Sherman Act.

125.    Plaintiff and Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by J&J's unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

**SECOND CLAIM FOR RELIEF**
**Violation of 15 U.S.C. § 2**
**Attempted Monopolization of All Relevant Markets**

126.    Plaintiff incorporates the preceding paragraphs by reference.

127.    J&J has attempted to monopolize the Infliximab Market in violation of Section 2 of the Sherman Act.

128.    J&J is violating Section 2 of the Sherman Act by attempting to implement the anticompetitive scheme set forth above with the specific intent to monopolize the Infliximab Market. J&J's scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

129.    There is a dangerous probability that J&J will succeed in monopolizing the Infliximab Market through its anticompetitive scheme.

130.    J&J's scheme has stifled competition in the Infliximab Market and thwarted Congress's purpose in enacting the BPCIA.

131.    Even if price were deemed to be the clearly predominant means by which competition is dangerously likely to be foreclosed, when the total amount of discounts and rebates that J&J offers to insurers and providers under the contracts described herein, including multi-product bundling arrangements, is attributed to the portion of Remicade sales that is contestable by a biosimilar like Inflectra, J&J is pricing Remicade below its own average variable cost.

132.    J&J's anticompetitive activities and their effects have caused injury to Plaintiff and Class Members.

133.    Had J&J competed on the merits instead of conspiring to restrain trade, Plaintiff and Class Members would have paid substantially lower prices for Remicade or would have had the option of purchasing a lower-cost Remicade biosimilar, like Inflectra or Renflexis.

134.    There are no legitimate business justifications for J&J's conduct, and any purported legitimate business justifications are mere pretexts.

135.    Plaintiff and Class Members have suffered harm, and are continuing to suffer harm, as a result of paying higher prices for Remicade than they would have absent J&J's efforts to arrest competition and maintain its monopoly in the Infliximab Market. Plaintiff and Class Members also face a continuing threat of injury from the unlawful conduct alleged in this Complaint in the form of continued supracompetitive prices for Remicade.

136.    Plaintiff and Class Members have been injured in their business and property in an amount to be established at trial.

137.    Plaintiff and Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 2 of the Sherman Act.

138.    Plaintiff and Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

### THIRD CLAIM FOR RELIEF
### Monopolization and Monopolistic Scheme Under State Law
### (On behalf of Plaintiff and the Damages Class)

139.    Plaintiff incorporates the preceding paragraphs by reference.

140.    J&J has knowingly engaged in an anticompetitive scheme designed to delay and block entry of biosimilar versions of Remicade. The intended and accomplished goal of the scheme was to use restrictive and exclusionary conduct to delay the ability of biosimilar manufacturers to launch competing, biosimilar versions of Remicade.

141.    Once Pfizer introduced Inflectra in 2016, J&J launched its "Biosimilar Readiness Plan" to attack competitors on the patent front and through the J&J sales force. Additionally, J&J

imposed pure exclusion contracts and fail first contracts, coupled with exclusionary rebates and bundling arrangements, upon nearly all healthcare insurers to make Remicade the only covered infliximab product.

142.    This anticompetitive conduct enabled J&J to maintain its monopoly and monopolistic prices over Remicade.

143.    Plaintiff and Class Members have suffered harm as a result of paying higher prices for Remicade than they would have absent J&J's anticompetitive conduct.

144.    J&J's conduct violated the following state antitrust laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

(e)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Class;

(f)    Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by members of the Class;

(g)    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Class;

(h)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class;

(i)      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Class;

(j)      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Class;

(k)      Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Class, in that sales of Remicade took place at Nevada pharmacies, purchased by Nevada Class Members at supracompetitive prices caused by Defendants' conduct;

(l)      N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire by members of the Class;

(m)      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Class;

(n)      N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Class;

(o)      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Class;

(p)      N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Class;

(q)      Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by members of the Class;

(r)      S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Class;

(s)    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, with Class Members in Tennessee paying substantially higher prices for Remicade at Tennessee pharmacies;

(t)    Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class;

(u)    W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class; and

(v)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class, in that the actions alleged herein substantially affected the people of Wisconsin, with purchasers in Wisconsin paying substantially higher prices for Remicade at Wisconsin pharmacies.

145.    Plaintiff and Class Members have been injured in their business or property by J&J's antitrust violations. Their injuries consist of (1) being denied the opportunity to purchase lower-priced biosimilar versions of Remicade, and (2) paying higher prices for these products than they would have paid in the absence of J&J's wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes J&J's conduct unlawful.

146.    Plaintiff and Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of J&J's anticompetitive conduct.

### FOURTH CLAIM FOR RELIEF
### Attempted Monopolization Under State Law
### (On Behalf of Plaintiff and the Damages Class)

147.    Plaintiff incorporates the preceding paragraphs by reference.

148.    J&J has knowingly engaged in an anticompetitive scheme designed to delay and block entry of biosimilar versions of Remicade. The intended and accomplished goal of the

scheme was to use restrictive and exclusionary conduct to delay the ability of biosimilar manufacturers to launch competing, biosimilar versions of Remicade.

149.    Once Pfizer introduced Inflectra in 2016, J&J launched its "Biosimilar Readiness Plan" to attack competitors on the patent front and through the J&J sales force. Additionally, J&J imposed pure exclusion contracts and fail first contracts, coupled with exclusionary rebates and bundling arrangements, upon nearly all healthcare insurers to make Remicade the only covered infliximab product.

150.    J&J acted with specific intent to monopolize the Infliximab Market, causing Plaintiff and Class Members to pay artificially inflated prices for these products.

151.    J&J intentionally and wrongfully attempted to monopolize the Infliximab Market in violation of the following state laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

(e)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Class;

(f)    Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by members of the Class;

(g)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Class;

(h)     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class;

(i)     Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Class;

(j)     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Class;

(k)     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Class, in that sales of Remicade took place at Nevada pharmacies, purchased by Nevada Class Members at supracompetitive prices caused by Defendants' conduct;

(l)     N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire by members of the Class;

(m)     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Class;

(n)     N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Class;

(o)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Class;

(p)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Class;

(q)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by members of the Class;

(r)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Class;

(s)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, with Class Members in Tennessee paying substantially higher prices for Remicade at Tennessee pharmacies;

(t)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class;

(u)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class; and

(v)     Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class, in that the actions alleged herein substantially affected the people of Wisconsin, with purchasers in Wisconsin paying substantially higher prices for Remicade at Wisconsin pharmacies.

152.    Plaintiff and Class Members have been injured in their business or property by J&J's antitrust violation. Their injuries consist of (1) being denied the opportunity to purchase lower-priced infliximab products, and (2) paying higher prices for these products than they would have paid in the absence of J&J's wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes J&J's conduct unlawful.

153.    Plaintiff and Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of J&J's anticompetitive conduct.

### FIFTH CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
### (On Behalf of Plaintiff and the Damages Class)

154.    Plaintiff incorporates the preceding paragraphs by reference.

155.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and Class Members were deprived of the opportunity to purchase biosimilar versions of Remicade and were forced to pay higher prices for Remicade.

156.    There has been a gross disparity between the price that Plaintiff and the Class Members paid for Remicade when compared to the less expensive biosimilar products, which would have been more widely available absent J&J's anticompetitive conduct.

157.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

**Florida Deceptive & Unfair Trade Practices Act ("FDUTPA")**
**Florida Stat. §§ 501.201,** *et seq.*

158.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

159.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

160.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.

161.    Defendants' conduct constitutes an unfair method of competition because Defendants engaged in an anticompetitive scheme to foreclose competition in the Infliximab Market.

162.     This foreclosure was the product of J&J's exclusionary contracts that were imposed on insurers to prevent biosimilar competition.

163.     Defendants' unlawful conduct had the following effects: (1) price competition for Remicade was restrained, suppressed, and eliminated throughout Florida; (2) Remicade prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida purchasers were deprived of free and open competition; and (4) Florida purchasers paid supracompetitive, artificially inflated prices for Remicade.

164.     Accordingly, such conduct falls within the prohibitions in Florida Stat. §§ 501.202(2).

**Massachusetts Consumer Protection Act ("MCPA")**
**Mass. Gen. L. Ch. 93A, et seq.**

165.     The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

166.     Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

167.     Defendants' conduct constitutes an unfair method of competition because Defendants restrained trade in the market for biosimilar versions of Remicade by engaging in an anticompetitive scheme to foreclose competition in the Infliximab Market.

168.    This foreclosure was the product of J&J's exclusionary contracts that were imposed on insurers to prevent biosimilar competition.

169.    Defendants' unlawful conduct had the following effects: (1) price competition for Remicade was restrained, suppressed, and eliminated throughout Massachusetts; (2) Remicade prices were raised, fixed, maintained and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts purchasers were deprived of free and open competition; and (4) Massachusetts purchasers paid supracompetitive, artificially inflated prices for Remicade.

## PRAYER FOR RELIEF

170.    Accordingly, Plaintiff, on its own behalf and on behalf of the proposed Classes, demands a judgment that:

A.    Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to members of the Classes under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Classes;

B.    Declares that Defendants' conduct violated Section 2 of the Sherman Act;

C.    Declares that the Defendants' conduct violated state antitrust and unfair competition and consumer protection laws as set forth herein;

D.    Enjoins Defendants from continuing their illegal activities;

E.    Enters judgment against Defendants joint and severally and in favor of Plaintiff and the Classes;

F.    Awards Plaintiff and the Classes damages, and multiple damages as permitted by law, in an amount to be determined at trial, including interest;

G.    Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.     Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all triable issues raised in this Complaint.

Dated: October 27, 2017

Respectfully submitted,

**LEVIN SEDRAN & BERMAN**

HOWARD J. SEDRAN (I.D. #39733)
AUSTIN B. COHEN (I.D. #78977)
KEITH J. VERRIER (I.D. #86577)
510 Walnut Street - Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
hsedran@lfsblaw.com
acohen@lfsblaw.com
kverrier@lfsblaw.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
RUDI JULIUS
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com
rjulius@labaton.com

*Counsel for Plaintiff UFCW Local 1500*
*Welfare Fund and the Proposed Classes*